**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO.: 1:11-CR-25 (WLS) |
| | : | |
| DANIEL ANDREW BARNARD and | : | |
| TISHA FOWLER, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

## <u>ORDER</u>

Before the Court is Defendant Fowler's Motion to Suppress (Doc. 63) and Motion to Suppress Based Upon An Unconstitutional Violation of Federal Rule of Criminal Procedure 41(b) (Doc. 64). For the following reasons, Defendant Fowler's Motion to Suppress (Doc. 63) and Motion to Suppress Based Upon An Unconstitutional Violation of Federal Rule of Criminal Procedure 41(b) (Doc. 64) are **DENIED**.

## <u>PROCEDURAL BACKGROUND</u>

On August 10, 2011, Defendant Barnard was charged in a six-count Indictment with distribution, manufacture, and possession with intent to distribute marijuana, as well as possession of a firearm in furtherance of a drug trafficking crime. (Doc. 1.) Defendant Barnard filed a Motion to Suppress (Doc. 24), which the Court denied on December 12, 2012. (Doc. 82.)

On December 15, 2011, Defendant Barnard was charged in a fifteen-count Superseding Indictment with distribution, manufacture, and possession with intent to distribute marijuana, distribution of a controlled substance analogue, JWH-250, possession with intent to distribute BZP/TFMPP and Stanozolol, as well as possession of a firearm in furtherance of a drug

1

trafficking crime.  (Doc. 37.)  Defendant Fowler was also charged in the same Indictment with one count of distribution of a controlled substance analogue, two counts of possession with intent to distribute marijuana, two counts of possession with intent to distribute BZP/TFMPP and Stanozolol, and two counts of possession of a firearm in furtherance of a drug trafficking crime. Defendant Fowler subsequently filed her Motions to Suppress (Docs. 63, 64).  On March 8, 2013, the Court allowed Defendant Barnard to join Defendant Fowler's Motions to Suppress. (Doc. 96.)  The Court limited Defendant Barnard to the arguments set forth in Defendant Fowler's briefs. A hearing on Defendant Fowler's Motions to Suppress was held on April 26, 2013.  The Court noted that Defendant Fowler's motion requested a *Franks* hearing, but that the motion failed to make the appropriate preliminary showing, and in general, was unsupported by any facts.  Counsel for Defendant narrowed the scope of the Motion considerably at the hearing to four issues and offered what it asserted was adequate support for suppression.  As the Government was not on notice as to the particularity argument raised by Defendant, the Court directed the parties to file supplemental briefing.  The parties have since filed their supplemental briefs.

**FINDINGS OF FACT**

At the April 26, 2013, hearing on Defendant Fowler's Motions to Suppress, the Government submitted a transcript of a hearing from the Superior Court of Decatur County. Defendant presented arguments without exhibits and without witnesses.  After reviewing the evidence and hearing arguments from both parties, the Court makes the following findings of fact:

On June 23, 2011, agents executed search warrants at Defendant Barnard's farm, located at 2785 Colquitt Highway, Bainbridge, Decatur County, Georgia (hereinafter referred to as "the

Ranch") and Defendant Barnard's Residence, located at 643 River Oaks Drive, Bainbridge, Decatur County, Georgia (hereinafter referred to as "the Residence"). The Ranch and Residence warrants were sworn by Special Agent R.S. Luke of the Georgia Bureau of Investigation before a judge of state court of record for Decatur County, Georgia. The warrants alleged that ecstasy, marijuana, United States currency, and items associated with the manufacture and distribution of marijuana would be found at the Ranch and Residence.

The affidavits in support of the search warrant for the Ranch and Residence, both dated June 22, 2011, first established the training and experience of the affiant, Agent Luke.[1] (Doc. 24-1 at 1-2.) Agent Luke's experience included working numerous narcotics investigations, including at least three large scale indoor marijuana manufacturing investigations. (*Id.* at 3.) Agent Luke stated that he has received specialized training concerning the production of controlled substances in clandestine laboratories, and had seized multiple items used to manufacture marijuana indoors. (*Id.*) Agent Luke noted that based on his training and experience, marijuana manufacturers generally maintained multiple, separate locations to grow marijuana to prevent law enforcement agencies from discovering the full operation should one location be compromised. (*Id.*) He further stated that, based on his training and experience, he knew that drug traffickers: (1) place assets in other persons' names or in the names of corporations to avoid detection and seizure by law enforcement personnel, but the traffickers still maintain control over these assets; (2) will keep large amounts of cash on hand to avoid taxes and to facilitate drug transactions; (3) will keep books, records, receipts, notes, ledgers, money orders, and documents related to the transportation and distribution of illegal drugs/narcotics; (4) will use the telephone to facilitate drug transactions; (5) will maintain the necessary

---

[1] The affidavit for the Ranch and the affidavit for the Residence, both signed by Agent Luke, are substantially identical and will be treated as one for the purposes of these Motions.

paraphernalia for manufacturing, packaging, cutting, weighing, and distributing narcotics; and (6) will often possess firearms to protect their drug organizations. (*Id.* at 3-4.)

Agent Luke then explained the operation of the instant marijuana manufacturing operation located at the Ranch and at the Residence, with information provided by six confidential informants, one concerned citizen, and the efforts of law enforcement personnel. The Ranch consists of a horse stable or barn, and two open storage buildings. (*Id.* at 1.) Agent Luke's affidavit states that the Ranch is owned by Super B Ranch LCC, which is registered to Defendant at the Ranch address.   The power bill for the Ranch is directed to the Residence, and the contact number for the Ranch's power bill is Defendant Barnard's cellular number. (*Id.* at 6.)

As stated in the affidavit, in the fall of 2010, a concerned citizen informed Pataula Drug Task Force ("PDTF") Agent Josh Suggs of an underground marijuana manufacturing operation. (*Id.* at 4.)  The citizen was informed by Skylar King that the marijuana was manufactured in an underground tractor trailer buried beneath a barn outside of Colquitt, Miller County, Georgia, and sold to an individual in Atlanta. (*Id.*)

In May 2011, the PDTF learned from a confidential source ("CS1") that Defendant Barnard was growing hydroponic marijuana in an underground trailer on a farm located between Colquitt, Miller County, Georgia and Bainbridge, Decatur County, Georgia on Georgia Highway 27. (*Id.*)  CS1 also stated that Blayne Ohearn, Skylar King, and Ried Dennis sold Defendant Barnard's marijuana, and that Defendant Barnard distributed acid at a music festival he hosted at the farm every May. (*Id.*)  Agent Luke stated in the affidavit that CS1 bore no ill will toward Defendant Barnard and was cooperating with law enforcement as consideration towards pending criminal charges.

On May 31, 2011, PDTF agents interviewed another confidential source ("CS2").  (*Id.*)
CS2 attended the music festival held at the Ranch on May 13, 2011.  (*Id.*)  While at the music
festival, CS2 accompanied a family member who purchased marijuana from Defendant Barnard.
(*Id.*)     During the transaction, Defendant Barnard provided CS2 a tour of the underground
marijuana growing facility at the Ranch.  (*Id.* at 5.)  CS2 provided a detailed description of the
facility, including its access point through the horse stable barn, general dimensions, the
approximate number of marijuana plants, harvesting schedule, other narcotics present in the
facility, and the lighting/ventilation system used to nourish the marijuana plants.  (*Id.*)  CS2 also
stated that Blayne Ohearn, Skylar King, and Ried Dennis sold Defendant Barnard's marijuana.
(*Id.*)     In the affidavit, Agent Luke stated that in his training and experience, marijuana
manufacturing operations are often placed underground to prevent detection, and that specialized
lighting/ventilation/irrigation systems are used by growers to cultivate marijuana continuously.
(*Id.*)     Agent Luke also stated that CS2 bore no ill will toward Defendant Barnard, was
cooperating in consideration for pending criminal charges, had been a confidential source for 11
years, had lead to the recovery of illegal narcotics and two arrests, and that CS2 had made a
controlled purchase of narcotics within a week of the date of the affidavit.  (*Id.*)

On June 16, 2011, PDTF Agents received the power records for Defendant's properties,
including the Ranch. The Agents were informed by the CEO of Three Notch Electric, the
company providing power to Defendant Barnard's properties, that the records for power usage at
the Ranch were consistent with usage that would occur at a residence, not at a horse stable.
Agent Luke stated that in his training and experience, power records of the type recorded at the
Ranch were indicative of a marijuana cultivation operation due to the fact that growers use high
intensity grow lights that (a) utilize a large amount of electricity and (b) are operated for long

periods of time.  Agents also took power readings from all three buildings located at the Ranch. The two open storage buildings reflected zero to low usage, with the horse stable recording the majority of the use for the time period between June 2010 and June 2011.  (*Id.*)

PDTF Agents supervised three controlled purchases of synthetic marijuana from the Store, which was owned by Defendant Barnard.  On May 26, 2011, and June 2, 2011, a confidential source (CS3) made controlled purchases at the Store.  (*Id.* at 5.)  Agent Luke stated in his affidavit that CS3 bore no ill will towards Defendant Barnard, was cooperating in consideration for pending criminal charges, and has provided information that has led to the recovery of illegal narcotics.  (*Id.* at 7.)  On June 9, 2011, a confidential source (CS5) made a controlled purchase of synthetic marijuana from Defendant Barnard at the Store.  (*Id.* at 5.) Agent Luke stated in his affidavit that CS5 bore no ill will towards Defendant Barnard, has made four controlled purchases of illegal narcotics within three months of the date of the affidavit that were considered prosecutable cases, and whose assistance has led to one arrest for the PDTF. (*Id.* at 7).

Agent Luke also states that another PDTF confidential source, CS4, made two recorded phone calls to Defendant Barnard's cellular phone number to discuss the purchase of marijuana and ecstasy.  (*Id.* at 5.)  During each phone call, Defendant Barnard stated that the marijuana was not yet ready.  (*Id.*)  Agent Luke also stated that the price discussed for the marijuana was consistent with the price charged for hydroponic grade marijuana, rather than the cheaper commercial grade marijuana.  (*Id.*)  Agent Luke stated in his affidavit that CS4 bore no ill will towards Defendant Barnard, was cooperating in consideration for pending criminal charges, and whose assistance has led to one arrest for the PDTF.  (*Id.* at 7.)

Between June 6, 2011, and June 19, 2011, PDTF agents observed a 2005 Dodge Ram truck at the Store and at the Ranch. (*Id.* at 5,6.) A GCIC inquiry showed that the vehicle was registered to Defendant at the Residence address. (*Id.*) In addition, the affidavit states that in February 2010, a Bainbridge Public Safety Confidential Source ("CS6") made a controlled purchased of one quarter ounce of hash from Defendant Barnard. (*Id.* at 6.)

Agents proceeded to execute the warrant on the Ranch on June 23, 2011. The scope of the search warrant covered three structures on the site: a building, the front part of which was comprised of a horse shelter/barn; and two other open storage buildings. The search of the building to which the horse barn was attached resulted in the discovery of marijuana, a marijuana grinder, suspected hash, cash, a vacuum sealer and bags, and several weapons. (Doc. 32 at 2.) Upon excavating a portion of the property underneath the horse barn, agents discovered an underground trailer containing a marijuana growing operation including 42 individual pots containing partial marijuana plants, as well as documents and ledgers indicting that Defendant had been growing marijuana at the Ranch since at least July 21, 2010, cultivating 961 plants during that time. (*Id.* at 2-3.)

Agents also executed the warrant on the Residence on June 23, 2011. The search of the Residence resulted in the discovery of pills of BZP, TFMPP and stanzolol, digital scales, a blunt roller, two marijuana pipes, a pill grinder, a handwritten ledger with data associated with the grow operation, $30,000 in cash, paperwork, and 15 different handguns, rifles, and shotguns. (*Id.* at 3-4.)

The Court now addresses Defendant Fowler's arguments.

## DISCUSSION

### I.      Probable Cause Standard

The Fourth Amendment of the U.S. Constitution provides that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation."   U.S. CONST. amend. IV. Accordingly, once it is established that a defendant possessed a reasonable expectation of privacy in the place searched or items seized, the Fourth Amendment requires a showing that the search or seizure was justified by a warrant supported by probable cause. *See Jackson v. Sauls*, 206 F.3d 1156, 1165-66 (11th Cir. 2000). "It is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (quoting *United States v. Hove*, 848 F.2d 137, 140 (9th Cir. 1988)).   Hence, the central focus of the warrant application, specifically the affidavit itself, must be "whether the suspect committed a crime and whether evidence of the crime is to be found at his home or business." *Id.* (citations omitted).

Information in the affidavit must also be fresh.  In other words, probable cause must exist at the time the magistrate judge issues a search warrant. *Id.* (citation omitted).  When reviewing staleness challenges, the Court may consider "the maturity of the information, nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched." *United States v. Schwinn*, 376 F. App'x 974, 977-78 (11th Cir. 2010) (quoting *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994)).

The totality of several factors, including information from informants about a defendant's criminal involvement, may give rise to the probable cause that connects a defendant or residence to be searched to criminal activity on the part of a defendant.  "If an informant is mentioned in

the affidavit, the affidavit must also demonstrate the informant's "veracity" and "basis of knowledge." *Id.* at 1314 (citation omitted).

As a final step in the warrant issuance process, the warrant application must be reviewed by "a neutral and detached magistrate" before it can be executed. *Martin*, 297 F.3d at 1316 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 450 (1971)). A magistrate judge should read the warrant and make his own independent assessment as to whether the warrant and its underlying affidavit contain a sufficient amount of information to support a finding of probable cause. *Id.* at 1317. Accordingly, the sole inquiry of this Court is whether the magistrate judge had a "substantial basis" for concluding that probable cause existed" based on his assessment of the facts before him, a finding to which this Court must give "great deference." *United States v. Moody*, 977 F.2d 1425 (11th Cir. 1992) (citations and internal quotation marks omitted); *see also United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990) ("[T]he practical nature of the magistrate's decision justifies . . . upon review . . . upholding the magistrate's findings even in marginal or doubtful cases."). Hence, only when the face of the "affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" should this Court invalidate the search warrant at issue in the current case. *See Martin*, 297 F.3d at 1313 (citation omitted).

## II.      Exclusionary Rule

The Fourth Amendment also protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Evidence seized as the result of an illegal search may not be used by the government in a subsequent criminal prosecution. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). The exclusionary rule, as it is known, is "a judicially created remedy designed to safeguard Fourth

Amendment rights generally through its deterrent effect." *United States v. Calandra*, 414 U.S. 338, 348 (1974). One exception to this exclusionary rule is the *Leon* good faith exception. *United States v. Leon*, 468 U.S. 897, 922 (1984), stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause. The <u>Leon</u> good faith exception applies in all but four limited sets of circumstances. *Id.* at 923. The four sets of circumstances are as follows: (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in," *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979); (3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where, depending upon the circumstances of the particular case, a warrant is "so facially deficient - i.e., in failing to particularize the place to be searched or the things to be seized - that the executing officers cannot reasonably presume it to be valid." *Id.* (internal quotation marks omitted).

The *Leon* good faith exception requires suppression "only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Leon*, 468 U.S. at 926. The purpose of the exclusionary rule is to deter unlawful police misconduct; therefore, when officers engage in "objectively reasonable law enforcement activity" and have acted in good faith when obtaining a search warrant from a judge or magistrate, the *Leon* good faith exception applies. *Id.* at 919-20.

## III.    Probable Cause for the Ranch and Residence Warrants

### A.    Parties' Arguments:

At the hearing, counsel for Defendant Fowler narrowed the scope of the Motions to: (1) whether a violation of Rule 41(b) existed; (2) whether the information provided by CS6 was stale; (3) whether the information provided by CS1 regarding Skylar King's statements was false; and (4) the alleged lack of particularity with respect to the address and building locations indicated in the warrant.  Defendant asserts that no probable cause existed to authorize the issuance of the warrants due to these alleged deficiencies.

       i.      Rule 41(b) violation:

Defendant Fowler argues that because Agent Luke expressed an intention to take the investigation to the federal government, he was required to abide by the specific requirements of Federal Rule of Criminal Procedure 41(b).  Accordingly, Defendant Fowler asserts two violations of Rule 41(b) require suppression of the evidence: (1) that Agent Luke failed to seek the assistance of a federal law enforcement officer to request issuance of the warrants; (2) that the warrants should have been signed by the available magistrate judge in Albany, GA, instead of by the Superior Court judge.

The Government asserts that Rule 41 applies only to warrants issued at the request of federal law enforcement officers.  As Agent Luke was a state law enforcement officer who presented a warrant to a state court, the Government argues that Rule 41 does not apply, and that even if it did apply, Congress did not provide suppression as a remedy for a violation of Rule 41(b).

The plain language of Rule 41(b) restricts the application of the Rule to warrants requested by federal officers.  The rule states that "at the request of a federal law enforcement officer or an attorney for the government," a magistrate judge or judge of a state court of record may issue a warrant.  Fed. R. Crim. P. 41(b).  "If the warrant is not issued upon the request of a

designated person it is not authorized by Rule 41 and, hence, not covered by the rule." *United States v. McKeever*, 905 F.2d 829, 832 (5th Cir. 1990). As our sister district court noted, "a 1972 amendment to Rule 41 "reflects a Congressional intent that none of Rule 41's requirements apply to state warrants." *United States v. Smith*, CRIMA4-96-CR-15 HLM, 1996 WL 735569 (N.D. Ga. Aug. 27, 1996) (citing to *McKeever*, 905 F.2d at 832).

The Ranch and Residence warrants were presented by a state officer to a Decatur County state judge, alleging a violation of Georgia drug trafficking laws. As such, Rule 41(b)'s restrictions on the actions of federal law enforcement officers do not seem to apply. Defendant asserts, without support, that because Agent Luke expressed the intent to "take the case federal," Rule 41(b) should still apply.

The Eleventh Circuit has held that a state search warrant must comply with federal standards if the search was "federal in execution," meaning a federal official "'had a hand in it.... The decisive factor...is the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means.'" *United States v. Lehder-Rivas*, 955 F.2d 1510, 1522 (11th Cir. 1992). There is no indication that federal agents played any role in providing intelligence information to the state officers involved. As such, the Court finds that Rule 41 was not violated in the issuance of the Ranch and Residence warrants.

ii.     Staleness:

During the hearing, Defendant Fowler argued that the warrants lacked probable cause because the information provided by CS6 regarding an alleged hash sale by Defendant Bernard was actually provided in 2009, not 2010 as previously stated in the warrants, and therefore even staler than previously believed. As the Court stated in its previous order:

> With regards to Defendant's argument regarding the staleness of the allegations related to the hash sale, the Court notes that Defendant was being investigated for

12

drug trafficking, an activity the Eleventh Circuit has previously noted to be inherently protracted and continuous, meaning that the specific dates within the affidavit indicating Defendant's participation in illegal activity are not as important. *See United States v. Magluta*, 198 F.3d 1265, 1272 (11th Cir. 1999). Even assuming that the hash sale alone was too stale to establish probable cause, "stale information is not fatal if the government affidavit updates, substantiates, or corroborates the stale material." *United States v. Green*, 40 F.3d 1167, 1172 (11th Cir. 1994). The bulk of the information presented in the affidavits indicates protracted and continuous drug trafficking and manufacturing activity, including several instances of recent trafficking and manufacturing activity that occurred just before the affidavit was submitted in support of the warrants for the Ranch and Residence. Accordingly, the Court finds that staleness of the hash sale is not fatal to a finding of probable cause when the totality of the allegations in the affidavit establishes probable cause that evidence of a crime would be found at the Ranch and Residence.

(Doc. 82 at 19 n.6). While the Court agrees that the information may be even more aged than previously believed, the Court's analysis for probable cause is still governed by the totality-of-the-circumstances approach set forth in *Illinois v. Gates*, 462 U.S. 213 (1983). Under that standard, a single flaw in the affidavit does not defeat probable cause. The Court has already addressed the staleness argument in its December 21, 2012, Order, and finds the analysis therein applicable here. Thus, any staleness does not defeat the remaining evidence of probable cause and in fact, only corroborates it.

### iii.    Information from Skylar King:

Defendant Fowler also argued that Skylar King never informed the concerned citizen about the buried trailer, and that all statements in the warrants to that effect were false. Defendant Fowler asserted that Mr. King was available to testify as well. The Government contends that Mr. King's denials are irrelevant for the purposes of a *Franks* hearing.

The issue for the Court in a *Franks* hearing is whether the affiant made a false statement or omission. Mr. King's testimony cannot establish what the concerned citizen told Agent Suggs, and thus it cannot help the Court determine whether Agent Suggs intentionally or

recklessly omitted material information or knowingly made false statements.  Accordingly, the Court finds that the truth of what Skylar King related to the concerned citizen fails to demonstrate that an omission or false statement was made by the affiant.

The Court agrees with Defendant that the affidavit does not provide the concerned citizen's veracity and basis of knowledge.  However, the Court addressed this issue at length in its previous Order, determining that the affidavit contained sufficient independent corroboration for the issuing judge to find the information provided by the concerned citizen reliable.  (*See* Doc. 82 at 15-17.)    Accordingly, the Court applies the same reasoning and makes the same findings here.

> iv.    Lack of Particularity with respect to the address and building locations indicated in the warrant:

Defendant Fowler contends that the Ranch search warrant is defective because: (1) the location of the property is identified by non-existent roads (US 84/Martha Berry Highway) and county lines (Miller/Colquitt County line); and (2) the affidavit does not specify which of the several barns on the property was to be searched.

The Government argues that warrant described the property with sufficient particularity because the property was identified correctly by street address, GPS coordinates, and physical description, and the alleged errors were in a supplemental paragraph providing driving directions.  The Government also argues that the warrant covered all three buildings at the address, described all three buildings by color, appearance, and material, and provided each building's relative location, thus obviating the need for further description.  Finally, the Government asserts that the good-faith exception would apply.

The particularity requirement of the Fourth Amendment requires a warrant to "particularly describ[e] the place to be searched, and the persons or things to be seized." "A

description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Wuagneux,* 683 F.2d 1343, 1348 (11th. Cir.1982).  The "test for determining the adequacy of the description of the place to be searched is whether it enables 'the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched.'" *United States v. Ellison,* 793 F.2d 942, 947 (8th Cir.1986), *cert. denied,* 479 U.S. 937, 107 S.Ct. 415, 93 L.Ed.2d 366 (1986).  The Eleventh Circuit has recognized "that the particularity requirement must be applied with a practical margin of flexibility, depending on the type of property to be seized, and that a description of the property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." *Wuagneux,* 683 F.2d at 1349.

With respect to the fictitious road and county line, the Court finds that the warrant enabled the executing officers to locate and identify the premises.  There is no dispute that the "Miller/Colquitt County line" and "US 84/Martha Berry Highway" identified in the warrant did not exist.  Thus, a person serving the warrant would have to seek clarification from the remaining information in the warrant, which included the correct GPS coordinates, address, and physical description of the location to be searched.  The address and GPS coordinates alone would prevent another premise from being mistakenly searched.  Moreover, the knowledge of the executing officer can be considered in determining the sufficiency of the description.  *See United States v. Sturmoski,* 971 F.2d 452, 458 (10th Cir. 1992); *see also United States v. Musson,* 650 F.Supp. 525, 538 (D. Colo. 1986).  As the affiant was also the executing officer, his knowledge of the property would have enabled the officers to locate the premises to be searched.  Under these circumstances, the Court finds no descriptive defect in the search warrant.

While Defendant Fowler also asserts that the Ranch warrant failed to identify the barn to be searched, the Court notes that the warrant specifically states that it covers all three structures at the address, not just a single structure.  The warrant describes the location, color, appearance, and building materials of each structure.  As such, the Court finds that the warrant was sufficient for the executing officers to identify each of the buildings described, and the Court rejects Defendant's particularity challenge to the Ranch warrant.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendant Fowler's Motion to Suppress (Doc. 63) and Motion to Suppress Based Upon An Unconstitutional Violation of Federal Rule of Criminal Procedure 41(b) (Doc. 64) are **DENIED**.

**SO ORDERED**, this _7<u>th</u>_ day of August, 2013.

<u>/s/ W. Louis Sands</u>
**THE HONORABLE W. LOUIS SANDS,
UNITED STATES DISTRICT COURT**